

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-29-2002

# Schnall v. Amboy Natl Bank

Precedential or Non-Precedential:

Docket 1-1502

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Schnall v. Amboy Natl Bank" (2002). *2002 Decisions.* Paper 52.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/52

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 28, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1502

MARTIN SCHNALL, individually and on behalf
of all others Similarly Situated, Appellant

v.

AMBOY NATIONAL BANK

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 99-cv-04908)
District Judge: Honorable Katharine S. Hayden

Argued: November 6, 2001

Before: BECKER, Chief Judge, McKEE and
RENDELL Circuit Judges.

(Filed: January 28, 2002)

STUART A. BLANDER, ESQUIRE
  (ARGUED)
Alan A. Heller, Esquire
Heller, Horowitz & Feit, P.C.
292 Madison Avenue
New York, NY 10017

ABE RAPPAPORT, ESQUIRE
David Kessler & Associates, L.L.C.
1373 Broad Street
Clifton, NJ 07013

Counsel for Appellant

DENNIS T. KEARNEY, ESQUIRE
  (ARGUED)
HELEN A. NAU, ESQUIRE
Pitney, Hardin, Kipp & Szuch, LLP
P.O. Box 1945
Morristown, NJ 07962-1945

Counsel for Appellee

DOLORES S. SMITH, ESQUIRE
Director
Board of Governors of the Federal
 Reserve System
Division of Consumer and
 Community Affairs
Washington, DC 20551

Counsel for Amicus Curiae at the
Invitation of the Court

OPINION OF THE COURT

BECKER, Chief Judge.

In this putative class action, plaintiff Martin Schnall alleges that the newspaper advertisements and account disclosures of defendant Amboy National Bank ("the Bank") violated the Truth in Savings Act ("TISA"), 12 U.S.C. SS 4301-13, and regulations promulgated by the Federal Reserve Board pursuant to the Act. In particular, Schnall contends that the Bank failed to calculate the advertised annual percentage yield ("APY") on its money market savings accounts according to the methods prescribed by the regulations and required by the statute. The District Court granted summary judgment for the Bank, holding that the advertisements and disclosures at issue did not violate TISA or the relevant regulations, and that even if they did, Schnall had failed to show that he was misled by the advertised rates. Schnall appeals, and we reverse, holding that the advertisements and disclosures at issue violated TISA and the Act's implementing regulations. This holding is buttressed by the letter-brief of the Federal

Reserve Board of Governors, amicus curiae at the request of the Court, which endorses this position.

Schnall brought this suit pursuant to 12 U.S.C.S 4310, which has since been repealed. See infra note 2. This section created a private cause of action for TISA violations, and provided for actual damages as well as statutory damages of between $100 and $1,000 in an individual action and "such amount as the court may allow" in a class action. See 12 U.S.C. S 4310. The Bank contends that even if there was a violation, Schnall may not recover statutory damages because he failed to establish that he was misled by or relied on the advertised rates or that he was financially harmed by the TISA violation. However, we hold that TISA imposes strict liability on depository institutions that violate its disclosure requirements, and that to recover statutory damages under S 4310, a plaintiff need not show that he relied to his detriment on the advertised APY, that he was misled by the advertised APY, or that he was financially harmed by the TISA violations. We therefore conclude that Schnall is entitled to partial summary judgment on the question of liability and will remand for a determination of damages.

I.

At various times between October 18, 1998 and October 10, 1999, the Bank placed in the Newark Star-Ledger a number of substantially identical advertisements promoting its Money Market Accounts. In bold letters and large typeface, these advertisements offered "a 3-month bonus of 6.00% APY." In smaller print, the advertisements stated that "[a]fter the bonus your yield is based on the 3-month Treasury Bill. Plus, we'll guarantee that the yield will always be higher than the combined average yield offered by the 3 largest NJ banks." The advertisements also set forth the APY that the accounts had earned during the previous year.

Consumers who called the phone number listed on the advertisements would receive from the Bank an application and Disclosure of Account Terms and Fees ("account disclosure"), which stated the APY in the same manner as

the advertisements. In particular, the account disclosure stated that an APY of 6% would apply for a period of 90 days from the date the account is opened. After that, "the Interest Rate paid on your account is based on the 3-month Treasury Bill and is guaranteed to be at least 1.00% higher than the average money market account yields of First Union/NJ, PNC Bank/NJ and Summit Bank as of the last business day of the previous month."

On October 16, 1998, before any of the advertisements at issue had been published, Schnall called the Bank to request an account application. On October 26, 1998, after seeing the advertisements described above, Schnall again phoned the Bank to request an application. The Bank sent Schnall an account disclosure and application, which he executed and returned, together with a check for $20,000 to open the advertised account. On or about October 28, 1998, the Bank received Schnall's application and check, and opened a Money Market Account in his name.

On October 18, 1999, Schnall filed this action on behalf of himself and a putative class of all persons who had deposited at least $20,000 into a Money Market Account with the Bank during the period from October 18, 1998 to October 18, 1999. The complaint alleged that the APY that appeared in the Bank's advertisements and account disclosures failed to comply with the required method of calculating the advertised APY under TISA and its implementing regulations. In particular, Schnall contends that under the regulations, the Bank may not advertise a 6% APY for the first three months and a variable rate APY for the remainder of the account term. Rather, in Schnall's submission, the regulations require the Bank to advertise a single "blended," or "composite," APY that represents the total yield on the account over a term of one year. According to Schnall, the regulations require this blended APY to be computed by applying the introductory rate for the first three months and applying whatever the variable rate was at the time of the advertisements for the remaining nine months, even though the resulting blended APY, which the Bank is required to advertise, may differ from the actual APY at the end of the year, depending on whether the variable rate changes.

4

The District Court granted the Bank's motion for summary judgment and denied Schnall's cross-motion for partial summary judgment. In an oral opinion, the Court held that because the variable rate on the accounts is a function of both the 3-month Treasury Bill as well as the APY of three other banks, the requirement that advertisements disclose the APY as a single blended rate was inapplicable, and the advertisements therefore complied with TISA. The Court further concluded that even if the Bank's advertisements and account disclosures violated TISA, summary judgment in favor of the Bank was appropriate because Schnall had failed to produce sufficient evidence that he relied to his detriment on the advertised APY.

The District Court had subject matter jurisdiction pursuant to 12 U.S.C. S 4310(e) and 28 U.S.C.S 1331, and this Court has appellate jurisdiction pursuant to 28 U.S.C. S 1291. We review de novo the District Court's disposition of the parties' cross-motions for summary judgment, see Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001), under the familiar standard set forth in the margin.1 We turn first to whether the advertisements and disclosures in question violated TISA and the implementing regulations, and then address whether TISA imposes strict liability on depository institutions that violate its disclosure requirements or whether a plaintiff must also establish reliance or some form of financial injury.

II.

Schnall commenced this suit pursuant to a now-repealed provision of TISA, which created a private right of action

_____

1. Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The judge's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

against "any depository institution which fails to comply
with any requirement imposed under this chapter or any
regulation prescribed under this chapter . . . ." 12 U.S.C.
S 4310(a).2 Thus, Schnall may establish liability by showing
that the Bank's advertisements and account disclosures

_____

2. Section 4310 was repealed as of September 30, 2001. See Act of Sept.
30, 1996, Pub. L. 104-208, S 2604(a), 110 Stat. 3009, 3009-470 (1996)
("Effective as of the end of the 5-year period beginning on the date of
the
enactment of this Act [September 30, 1996], section 271 of the Truth in
Savings Act (12 U.S.C. S 4310) is repealed."). Although private parties
may no longer sue for violations of TISA, the Federal Reserve Board
retains authority to enforce compliance. See 12 U.S.C. S 4309.

The Bank does not argue that S 4310 is inapplicable to this action,
which was filed before S 4310 was repealed, and we believe that
pursuant to 1 U.S.C. S 109, Schnall's action survives the repeal. Section
109 provides that "[t]he repeal of any statute shall not have the effect
to
release or extinguish any . . . liability incurred under such statute,
unless the repealing Act shall so expressly provide, and such statute
shall be treated as still remaining in force for the purpose of sustaining
any proper action . . . for the enforcement of such . . . liability."
Since
the repeal of S 4310 did not expressly provide for retroactive
application,
Schnall's claims survive under S 109.

We acknowledge that it could be argued that S 109 does not apply in
this case, because S 4310 contained, inter alia, a subsection conferring
jurisdiction on district courts to hear private TISA actions. See 12
U.S.C.
S 4310(e). In repealing S 4310, Congress therefore withdrew jurisdiction,
and the Supreme Court in Bruner v. United States , 343 U.S. 112 (1952),
held that S 109 does not apply to repeals that simply withdraw the
jurisdiction of a federal district court without extinguishing any
liability.
Id. at 116-17 ("[W]hen a law conferring jurisdiction is repealed without
any reservation as to pending cases, all cases fall with the law."). We
believe that Bruner is distinguishable, however, because unlike in
Bruner, where the withdrawal of jurisdiction from federal district courts
left the plaintiff with an alternate remedy in the Court of Claims, see
343
U.S. at 115, the repeal of S 4310 not only withdrew the jurisdiction of
federal district courts to hear private TISA enforcement actions, but also
entirely eliminated the cause of action, thereby releasing banks from
future claims of private parties to recover actual and statutory damages
for TISA violations. See De La Rama Steamship Co., Inc. v. United States,
344 U.S. 386, 390 (1953) (holding that under S 109, pending appeals
survive "the repeal of statutes which create rights and also prescribe how

the rights are to be vindicated," and distinguishing "the repeal of statutes solely jurisdictional in their scope") (emphasis added).

6

violated either a provision of TISA itself or a regulation promulgated pursuant to TISA. We consider first whether the Bank's disclosures violated requirements imposed by the regulations, and then turn to whether the disclosures also violated requirements imposed by TISA itself.

A.

1.

The relevant regulations were promulgated by the Federal Reserve Board pursuant to 12 U.S.C. S 4308(a), and are found in 12 C.F.R. Part 230, known as Regulation DD. Under the regulations, account disclosures and advertisements that state a rate of return are required to state the account's annual percentage yield. See 12 C.F.R. S 230.4(b)(1)(i) ("Account disclosures shall include the following, as applicable: . . . The `annual percentage yield' and the `interest rate,' using those terms . . . ."); 12 C.F.R. S 230.8(b) ("If an advertisement states a rate of return, it shall state the rate as an `annual percentage yield' using that term."). The regulations define "annual percentage yield" as "a percentage rate reflecting the total amount of interest paid on an account, based on the interest rate and the frequency of compounding for a 365-day period and calculated according to the rules in appendix A of this part." 12 C.F.R. S 230.2(c).

Part I.A of appendix A provides that "[f]or accounts without a stated maturity date (such as a typical savings or transaction account), the calculation shall be based on an assumed term of 365 days."3 Because the accounts at issue in this case lack a stated maturity date, the advertised APY must therefore assume a term of 365 days.

Part I.B of appendix A specifically defines how the APY should be computed for "stepped-rate accounts," which are accounts that apply different interest rates during different

_____

3. For such accounts, Part I.A provides that "the annual percentage yield can be calculated by use of the following simple formula: APY = 100 (Interest/Principal)," where "Interest" is the total dollar amount of interest earned on the Principal during the 365 day term.

7

periods of the term: "For accounts with two or more interest rates applied in succeeding periods . . . an institution shall assume each interest rate is in effect for the length of time provided for in the deposit contract." If, for example, a bank offers a savings account with a 7% interest rate for the first six months and a 3% interest rate thereafter, appendix A requires the advertised APY to be the blended rate calculated by applying the 7% interest rate for the first six months and the 3% interest rate for the remaining six months.

Finally, Part I.C of appendix A specifies how this blended-rate calculation should be performed for a variable rate account, which the regulations define as "an account in which the interest rate may change after the account is opened." 12 C.F.R. S 230.2(v). Part I.C specifically defines the method of calculation for accounts such as those at issue in this case, where an initial fixed rate applies for a given period, followed by a variable rate for the remainder of the term:

> Variable-rate accounts with an introductory premium (or discount) rate must be calculated like a stepped-rate account. Thus, an institution shall assume that: (1) The introductory interest rate is in effect for the length of time provided for in the deposit contract; and (2) the variable interest rate that would have been in effect when the account is opened or advertised (but for the introductory rate) is in effect for the remainder of the year. If the variable rate is tied to an index, the index-based rate in effect at the time of disclosure must be used for the remainder of the year.

Part I.C illustrates the required method of calculation by using the example of an account that pays an introductory 7% interest rate for the first three months and a variable rate thereafter, which at the time of the disclosure is 5%. In this example, the advertised APY must be computed by applying the 7% interest rate for the first three months and by applying the current 5% variable rate for the remaining nine months of the term, yielding an APY of 5.65%. Thus, in calculating the APY, a bank must assume that the variable rate that is in effect at the time of the disclosure will remain in effect throughout the term, even though this

8

assumption means that the APY that the regulations require the bank to advertise will differ from the actual APY that the consumer will earn on the account should the variable rate change.

2.

Applying this method of calculation to the Amboy Money Market Account, we agree with Schnall that the Bank's advertisements and account disclosures violate the regulations, since they fail to state the APY as a single composite rate computed on a one-year term, as required by appendix A. Instead of calculating the APY by applying the introductory 6% APY for the first three months and assuming that the variable rate at the time of the disclosure would remain in effect throughout the remaining nine months of the term, the Bank simply advertised an initial 6% APY followed by a variable rate set by the 3-month Treasury Bill and guaranteed to exceed the combined average yield of New Jersey's three largest banks.

The Bank contends that the District Court correctly concluded that the method of calculating the APY specified in appendix A is inapplicable because the variable rate in this case is determined not only by the 3-month Treasury Bill, but also by the average money market account yields of the three largest New Jersey Banks (First Union/NJ, PNC Bank/NH, and Summit Bank). We disagree.

First, appendix A clearly states that with only one exception, not applicable to this case, the APY that is advertised must be calculated according to the specified method: "Except as provided in Part I.E. of this appendix, the annual percentage yield shall be calculated by the formula shown below."4 This statement definitively establishes that the specified formula must be applied in this case.

Second, the regulations do not distinguish among different types of variable rates for purposes of computing the APY that must be advertised. Under Part I.C of the

_____

4. The exception in Part I.E applies to "time accounts with a stated maturity greater than one year that pay interest at least annually."

9

appendix, "Variable rate accounts with an introductory premium (or discount) rate must be calculated like a stepped-rate account." And the definitions section of the regulations provides that "[v]ariable-rate account means an account in which the interest rate may change after the account is opened." 12 C.F.R. S 230.2(v). Thus, the regulations treat all variable rates alike, regardless whether the rates are a function of one variable, two variables, or twenty variables. That the variable rate in this case, rather than being solely a function of the 3-month Treasury Bill, is a function of both the 3-month Treasury Bill and the combined average yield of the three largest New Jersey Banks, is immaterial for purposes of the regulations.

Regardless of what the variable rate depends on, under the regulations a bank must determine what the variable rate would be at the time of the advertisement, and assume that that rate will remain in effect throughout the relevant part of the term, for purposes of computing the APY that the bank may advertise. Thus, the regulations require Amboy to advertise a single blended APY calculated by applying the 6% APY for the first three months and by applying for the remaining nine months whatever the current variable rate was at the time of the advertisement. This it did not do.

3.

The Bank urges us to adopt the District Court's reasoning that the guarantee that the APY for the remainder of the term would exceed the average APY of the Bank's three competitors is pro-consumer, and therefore that it should be allowed to advertise that fact. In our view, this argument proves too much, since it would apply to any variable rate that is determined by reference to an index or a competing investment. For example, a variable rate that is set to the 3-month Treasury Bill is pro-consumer, since it guarantees that consumers will never earn less on their savings account than they would on the Treasury Bill. Nonetheless, the regulations require that variable rates be advertised according to a particular formula, regardless of how pro- or anti-consumer the rate is.

10

The District Court also worried that the APY that the Bank would be required to advertise under the regulations would be misleading because "[i]t would not help the consumer know whether this particular snapshot will turn out to be accurate for the long run . . . ." We agree that the advertised rate required by the regulations may mislead consumers, since the advertised APY could differ from the actual APY. Consider two banks, one of which offers a fixed rate account with a 4% APY and the other of which offers a variable rate account that, using the variable rate in effect at the time of the advertisement, would have a 4% APY. Under the regulations, both banks must advertise the same APY of 4%, which risks misleading consumers to believe that the two investments are of equal value. This risk is mitigated, however, by the requirement that advertisements for variable rate accounts "shall state . . . clearly and conspicuously . . . that the rate may change after the account is opened." 12 C.F.R. S 230.8(c)(1).

Moreover, even if the regulations required rates to be advertised in a misleading manner, unless the defendant challenged the regulations' validity, the Court would be constrained to apply the regulations that exist. Whether these regulations make sense as a matter of policy is irrelevant in this case, since the Bank does not challenge the regulations' validity on the grounds that the Federal Reserve Board exceeded its authority under TISA, acted arbitrarily and capriciously in promulgating the regulations, or failed to comply with the procedural requirements imposed by the Administrative Procedure Act. Absent such a challenge, a court may not second-guess the policy choices made by an agency in a matter that Congress has committed to the agency's discretion.

4.

We therefore conclude that the Bank's advertisements and account disclosures violated the regulations promulgated under TISA by failing to advertise the APY as a single composite rate based on a one-year term, calculated by applying the 6% introductory rate for the first three months and by applying whatever the variable rate was at the time of the advertisements for the remaining

11

nine months. We note that this conclusion is supported by an amicus letter brief filed at the Court's invitation by the Board of Governors of the Federal Reserve System. Signed by the Director of the Division of Consumer and Community Affairs, the letter concludes that "Amboy did not comply with the requirements set forth in Regulation DD because . . . the advertisements did not disclose a single `composite' APY, based on an assumed term of 365-days, and taking into account both the introductory rate and post-introductory rate in effect for these accounts at the time they were advertised."

B.

The Bank argues that even if its advertisements and account disclosures failed to comply with the regulations, the advertisements nonetheless complied with the statutory disclosure requirements. Therefore, the Bank submits, Schnall's claims were properly dismissed. We disagree. Even if the Bank's advertisements complied with the statutory requirements, the Bank would still be liable for violating the regulations, since at the time this lawsuit was filed, TISA imposed civil liability on any bank"which fails to comply with any . . . regulation prescribed under this chapter." 12 U.S.C. S 4310(a).

At all events, we conclude that the Bank violated the statutory disclosure requirements. The Bank argues that its advertisements fully complied with the disclosure requirements of TISA, which requires that

> Each advertisement . . . relating to any . . . interest-bearing account . . . which includes any reference .. . to a specific yield . . . shall state the following information, to the extent applicable, in a clear and conspicuous manner:
>
> (1) The annual percentage yield.
>
> (2) The period during which such annual percentage yield is in effect.
>
> (3) All minimum account balance and time requirements which must be met in order to earn the advertised yield . . . .

12

(4) The minimum amount of the initial deposit which is required to open the account in order to obtain the yield advertised . . . .

(5) A statement that regular fees or conditions could reduce the yield . . . .

(6) A statement that an interest penalty is required for early withdrawal.

12 U.S.C. S 4302(a). In the Bank's submission, by disclosing in its advertisements that its accounts would earn a 6% APY for the first three months, followed by an APY based on the 3-month Treasury Bill but guaranteed to exceed the average yield of New Jersey's three largest banks, the Bank complied with the requirement of S 4302(a)(1) that advertisements disclose the"annual percentage yield."

The problem with the Bank's argument, however, is that TISA defines "annual percentage yield" as:

> the total amount of interest that would be received on a $100 deposit, based on the annual rate of simple interest and the frequency of compounding for a 365-day period, expressed as a percentage calculated by a method which shall be prescribed by the Board in regulations.

12 U.S.C. S 4313(2). This definition of "annual percentage yield" applies to the requirements in SS 4302(a)(1) and 4303(c)(1) that advertisements and account disclosures state the annual percentage yield. Because, as explained above, the Bank failed to calculate the APY appearing in its advertisements and account disclosures according to the method prescribed by the regulations, the Bank failed to comply with the statutory disclosure requirements imposed by SS 4302(a)(1) and 4303(c)(1).

The District Court focused on the language "to the extent applicable" in S 4302(a), and concluded that the required method of computing the advertised APY is not applicable here, because the variable rate is a function of both the 3-month Treasury Bill and the average yield of three other banks. The District Court further reasoned that the method of calculating the APY specified in the regulations is

13

inapplicable in this case because "blind adherence" to the regulation "would not assist [the] consumer in comparing" Amboy's account with accounts offered by competitors. According to the District Court, applying the formula specified in the regulations would thereby frustrate one of the stated purposes of TISA, which is to enhance "the ability of the consumer to make informed decisions regarding deposit accounts." 12 U.S.C. S 4301.

We disagree with the District Court's interpretation of "to the extent applicable" as an invitation to courts to disregard the mandate of the regulations if doing so makes sense as a matter of policy. In our view, the language "to the extent applicable" was included in S 4302(a) because certain disclosure requirements enumerated in that provision may not apply to a particular account, given the nature of the account. For example, S 4302(a)(6) requires advertisements to include "[a] statement that an interest penalty is required for early withdrawal." This requirement, however, would obviously be inapplicable to an account that has no withdrawal penalty.

In contrast, the requirement under S 4302(a)(1) that advertisements disclose the account's APY is applicable to all interest-bearing accounts, including the account at issue in this case. As discussed above, the formula in the regulations for computing an account's APY is fully applicable to accounts such as Amboy's, which include an introductory fixed interest rate followed by a variable rate for the remainder of the term.

In sum, we hold that by failing to disclose the APY on its accounts as a single blended rate based on a 365-day term, the Bank's advertisements and account disclosures violated both the disclosure requirements found in the regulations, see 12 C.F.R. SS 230.2, 230.4, 230.8 & appendix A to part 230, and the disclosure requirements imposed by the relevant statutory provisions, see 12 U.S.C. SS 4302, 4303, 4305 & 4313, which incorporate the regulations by reference. Either the violation of the statute or the violation of the regulations provides an independent ground for liability under S 4310.

14

III.

The Bank argues that even if its advertisements and account disclosures violated the requirements imposed by TISA and the implementing regulations, the District Court properly granted summary judgment on the ground that no reasonable jury could find that Schnall was harmed by the manner in which the Bank disclosed the APY on its accounts. The Bank frames this argument in various terms, arguing that Schnall did not rely on the manner in which the Bank advertised its APY, that Schnall was not misled by the advertisements and disclosures, and that Schnall suffered no financial injury as a result of the TISA violations. Each characterization relates to the same conceptual question whether a TISA plaintiff must show that he or she suffered some financial injury that he would not have incurred had the defendant complied with TISA. Schnall responds that TISA imposes strict liability on depository institutions that violate its disclosure requirements, and that to recover under S 4310, a plaintiff need not show that he or she was misled or financially harmed by the violation.

The relevant provision of TISA, 12 U.S.C. S 4310(a), which has been repealed since the commencement of this lawsuit, see supra note 2, provided that:

> [A]ny depository institution which fails to comply with any requirement imposed under this chapter or any regulation prescribed under this chapter with respect to any person who is an account holder is liable to such person in an amount equal to the sum of --
>
> (1) any actual damages sustained by such person as a result of the failure;
>
> (2)(A) in the case of an individual action, such additional amount as the court may allow, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000; or
>
>  (B) in the case of a class action, such amount as the court may allow, except that--
>
>  (i) as to each member of the class, no minimum recovery shall be applicable; and

15

(ii) the total recovery under this subparagraph in any class action . . . arising out of the same failure to comply by the same depository institution shall not be more than the lesser of $500,000 or 1 percent of the net worth of the depository institution involved; and

(3) in the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with a reasonable attorney's fee as determined by the court.

The question before us reduces to whether the language imposing liability for any violation "with respect to any person who is an account holder" requires account holders who bring suit to show that they would not have opened their account had the bank's disclosure complied with TISA, or that they were otherwise misled or financially harmed by the TISA violation.

In deciding this question, we are writing on a clean slate, as this Court has not had occasion to construe S 4310. The only court squarely to address the issue was the District Court for the Southern District of New York in Hale v. Citibank, N.A., 198 F.R.D. 606 (S.D.N.Y. 2001). In an opinion by Judge Rakoff, the court in Hale rejected defendants' claim that reliance is a necessary element of a cause of action under S 4310:

[N]either the regulation nor TISA itself requires such a showing as a condition of liability, and such exacting notions of reliance, drawn from the common law, are inapplicable, so far as liability is concerned, to a regulatory statute like TISA whose stated purpose is "to require the clear and uniform disclosure of . . . the rates of interest which are payable on deposit accounts by depository institutions." 12 U.S.C. S 4301(b) (emphasis added); see also S. Rep. 102-167, at 80-82 (1991).

Id. at 607.5 We find this reasoning persuasive.6 As the

_____

5. The court noted that reliance might be relevant, however, for purposes of determining actual (in contrast to statutory) damages. Id.

6. The only other case to discuss the issue is Shelley v. AmSouth Bank,

16

Court in Hale noted, neither the statute nor the regulations explicitly require that a plaintiff show reliance or financial injury to recover statutory damages under S 4310.

Moreover, the purpose of TISA is not only to prevent consumers from being misled by deceptive advertisements, but also to ensure uniformity in how banks advertise rates of return. See 12 U.S.C. S 4301 ("The Congress hereby finds that economic stability would be enhanced, competition between depository institutions would be improved, and the ability of the consumer to make informed decisions regarding deposit accounts, and to verify accounts, would be strengthened if there was uniformity in the disclosure of terms and conditions on which interest is paid and fees are assessed in connection with such accounts."). This consideration also supports the result reached in Hale.

We read the regulations promulgated under TISA as representing a policy judgment by the Federal Reserve Board that even if consumers are not misled by advertisements that violate the regulations, they benefit from the requirement that banks advertise their returns according to a standard formula that allows quick and accurate comparison of the expected rates of return offered by different banks, thus promoting informed consumer choice and competition among banks. The harm that TISA is intended to prevent, therefore, is not only the financial harm that occurs when a consumer is misled by an advertisement, but also the information costs and anti-competitive effects created when banks advertise yields in non-uniform ways that make it difficult for consumers to compare the rates of return offered by competing banks.

Contrary to the purpose of TISA, interpreting S 4310 to require reliance or financial injury would permit banks to violate TISA's uniform disclosure requirement as long as the advertisements issued by the banks were not themselves misleading. Indeed, the advertisements in this

_____

No. 97-1170-rv-c, 2000 WL 1121778 (S.D. Ala. July 24, 2000), aff 'd, 247 F.2d 250 (11th Cir. 2001), which briefly stated in dicta that "proximate cause and actual damages are not elements of a TISA claim for statutory damages." Id. at *14.

17

case, although they prominently feature the "6.00% APY," are quite clear that this APY is in effect for only an introductory period of three months. It would therefore be difficult for a consumer to show that he was misled by the advertisement into believing that the 6% APY would be in effect for longer than three months. Schnall, as an M.B.A. and statistician, see infra note 7, could have easily computed from the information in the Amboy advertisement the blended APY that the Bank was required to disclose, and could have then compared that APY to those offered by other banks. One of the purposes of TISA, however, is to relieve consumers of this burden, for comparing the yields offered by different banks may be difficult for many consumers and will take unnecessary time if the yields are not advertised uniformly. In order for the regulations in this case to have any bite, they must therefore be enforced even when advertisements are not necessarily misleading.

To be sure, violations of TISA that do not actually cause consumers to be misled could still be prosecuted by the Federal Reserve Board. But the structure of S 4310, which permitted a plaintiff to recover both actual damages and statutory damages, suggests that this provision served the dual purpose of both compensating plaintiffs who have been misled and deterring banks from advertising in ways that Congress and the Federal Reserve Board believe are socially harmful. Cf. Williams v. Pub. Fin. Corp., 598 F.2d 349, 356 (5th Cir. 1979) ("The remedial scheme in the [Truth in Lending Act] is designed to deter generally illegalities which are only rarely uncovered and punished, and not just to compensate borrowers for their actual injuries in any particular case.").

We acknowledge that as a matter of policy, it seems odd to permit plaintiffs to sue banks for damages when they have personally suffered no financial loss as a result of the bank's TISA violation.7 This result, however, is what S 4310,

_____

7. A law professor probably could not have imagined a better hypothetical than this case, in which the plaintiff, Martin Schnall, has an M.B.A. from NYU and masters degrees from Columbia University and University of Michigan in biostatistics. Indeed, it is possible that Schnall
never intended to invest his money in a savings account, but saw an

18

as a "private attorney general" statute, contemplated. Although TISA authorizes the Federal Reserve Board to enforce the Act, see 12 U.S.C. S 4309, the Board has limited resources to devote to enforcement, and Congress may have deemed it more cost-effective to cede TISA enforcement to individuals in the private sector who stand to profit from efficiently detecting and prosecuting TISA violations.

We also note that S 4310 provided an affirmative defense to defendants who unintentionally violate TISA. See 12 U.S.C. S 4310(c) ("A depository institution may not be held liable in any action brought under this section for a violation of this chapter if the depository institution demonstrates by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."). Since a plaintiff who suffers actual financial harm as a result of being misled by a TISA violation will go uncompensated if the violation is inadvertent under S 4310, the primary purpose of S 4310 may not have been compensation, but rather deterrence. This deterrent purpose is furthered under S 4310 by permitting account holders to bring TISA actions even if they have not suffered any financial harm as a result of the violation.

Finally, our conclusion is consistent with the jurisprudence construing the provision of the Truth in Lending Act ("TILA") upon which S 4310 appears to have been modeled. The private enforcement provision of TILA uses almost the same language as S 4310 in creating a private right of action:

> [A]ny creditor who fails to comply with any requirement imposed under this part . . . with respect to any person

_____

advertisement that he knew violated TISA, and opened an account precisely so that he could then sue the bank under TISA and earn statutory damages. Under our construction of S 4310, such a plaintiff would nonetheless be entitled to statutory damages, making him better off than he would have been had TISA not been violated.

19

is liable to such person in an amount equal to the sum of --

(1) any actual damage sustained by such person as a result of the failure;

(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction . . . ; or

 (B) in the case of a class action, such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same creditor shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the creditor . . . .

15 U.S.C. S 1640(a). A comparison of the language and structure of this provision with the language and structure of S 4310, quoted supra at 15-16, leaves little doubt that Congress, in enacting S 4310 in 1991, consciously borrowed the language of TILA.

This Court has squarely held that reliance is not an element of a cause of action under TILA. See Manning v. Princeton Consumer Disc. Co., 533 F.2d 102, 106 (3d Cir. 1976) ("Although it is extremely unlikely that the purchaser was not aware of the undisclosed terms, i.e., selling price, down payment and balance, we cannot say that the district court erred in imposing the penalty and attorneys' fees under the circumstances here."); see also Dzadovsky v. Lyons Ford Sales, Inc., 593 F.2d 538, 539 (3d Cir. 1979) (per curiam) (rejecting "the requirement of financial loss before a borrower may bring an action" under TILA). Indeed, as noted in the margin, those Courts of Appeals that have considered the issue are nearly unanimous that to recover statutory damages under TILA, plaintiffs need not show that they would not have agreed to the transaction had the lender's disclosure complied with TILA

20

or that they were otherwise misled or suffered financial
injury as a result of the TILA violation.8

Given the similar purposes of TISA and TILA and the
_____

8. See, e.g., Mars v. Spartanburg Chrysler Plymouth, Inc., 713 F.2d 65, 66
(4th Cir. 1983) ("The district court held that these violations were only
technical and because [plaintiff] sustained no actual injury as a result
of
them, no liability on the part of the creditors arose. We disagree and
reverse the judgment of the lower court."); Brown v. Marquette Sav. &
Loan Ass'n, 686 F.2d 608, 614 (7th Cir. 1982) ("As an initial matter we
note that the violation before us is a purely technical one, and that the
plaintiffs do not claim that they were misled or suffered any actual
damages as a result of the statutory violation. It is well settled,
however,
that a borrower need not have been so deceived to recover the statutory
penalty."); Dryden v. Lou Budke's Arrow Fin. Co., 630 F.2d 641, 647 (8th
Cir. 1980) ("TILA plaintiffs, otherwise entitled to recover, need not show
that they sustained actual damages stemming from the TILA violations
proved before they may recover the statutory damages the Act also
provides for."); Smith v. Chapman, 614 F.2d 968, 971 (5th Cir. 1980) ("It
is not necessary that the plaintiff-consumer actually have been deceived
in order for there to be a [TILA] violation."); Hinkle v. Rock Springs
Nat'l
Bank, 538 F.2d 295, 297 (10th Cir. 1976) ("It is apparent that no
showing of actual damages is required and instead the recovery is fixed
by statute.").

The only case to depart from strict liability under TILA is Streit v.
Fireside Chrysler-Plymouth, Inc., 697 F.2d 193 (7th Cir. 1983), in which
the defendant, a car dealer, allegedly violated TILA by neglecting to
provide the plaintiff with a duplicate of the retail installment contract.
Id.
at 194. After paying a portion of the down payment, the plaintiff
returned the car claiming that it was defective and refused to pay any
installments. Id. at 194-95. The court rejected the plaintiff's TILA
claim:

        [I]t is not good policy and is not required by a reasonable
        construction of the Act to hold a creditor liable for a technical
        violation of the sort here involved: where the consumer was not
        misled nor financially harmed and where the consumer unilaterally
        breached the contract almost immediately after it was entered. The
        purposes of the Act and the respect the Act is due are not served
by
        a rigid application that results in an unjustified windfall to the
        consumer.

Id. at 197. The holding in Streit therefore appears confined to the
specific

facts of that case -- namely the hyper-technical nature of the violation (failure to provide a duplicate of the finance agreement) and the plaintiff's own actionable conduct (breach of contract).

21

fairly substantial body of TILA caselaw that existed at the time Congress enacted TISA in 1991, we presume that Congress was aware of the judicial interpretation of TILA and that in borrowing language from TILA, Congress intended that language to have the same meaning that courts had given TILA.9 Cf. Northcross v. Bd. of Educ., 412 U.S. 427, 428 (1973) (per curiam) (noting that "similarity of language . . . is, of course, a strong indication that . . . two statutes should be interpreted pari passu," particularly where "the two provisions share a common raison d'etre" (internal quotations omitted)). Since the TILA jurisprudence overwhelmingly rejects any reliance requirement, it seems likely that Congress did not intend to impose any such requirement under the similarly-worded provision of TISA.

For the foregoing reasons, we hold that to recover statutory damages under S 4310, a plaintiff need not show that he relied on the advertised APY, that he would not have opened the account had the advertisement complied with TISA, or that he was otherwise misled or financially harmed by the failure to comply with TISA's disclosure requirements.10

IV.

Because we hold that the Bank's advertisements and account disclosures violated TISA and the implementing regulations, and because we hold that to recover statutory

_____

9. The stated purpose of TISA is "to require the clear and uniform disclosure of . . . the rates of interest which are payable on deposit accounts by depository institutions . . . and the fees that are assessable against deposit accounts so that consumers can make a meaningful comparison between the competing claims of depository institutions with regard to deposit accounts." 12 U.S.C. S 4301(b). Similarly, the stated purpose of TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. S 1601(a).

10. To recover actual damages, however, a plaintiff must obviously show that he suffered some financial harm that he would not have suffered had the advertisements and disclosures in question complied with TISA.

22

damages an account holder need not show that he was misled or financially harmed by the defendant's failure to comply with TISA, we hold that Schnall is entitled to partial summary judgment on the question of liability. See Fed. R. Civ. P. 56(c) ("A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.").

Accordingly, the order of the District Court granting the Bank's motion for summary judgment and denying Schnall's cross-motion for partial summary judgment will be reversed, and this case will be remanded for further proceedings to determine the amount of damages to be awarded.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

23